Mr. Greenstone. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. The district court in this case abused its discretion to award Section 285Bs against Summit, a party who was in a winning position at the time that it chose for economic reasons to dismiss voluntarily. It would send the worst possible message to the federal court system, to parties, to district judges, if this court were to affirm. It would mean that a party who has a case that the party discovers is a merits winner, but a money loser, would have to go through the irrational process of taking the case through trial or otherwise risk ruinous sanctions. Doesn't that start the analysis long after the basic problem arose? That is, you had a case that either 100 percent or say 47 percent was going to be based on use of certain Microsoft products. I gather it's just not disputed as the case comes to us that you did not check whether that claim failed because of a license to Microsoft and therefore by the time the later events arose, that piece of the case was going to go away and you hadn't developed the alternative piece of the case in a serious way and in any event, you decided the rest of the case wasn't worth pursuing. If I may answer the question in two or three parts. The first part being, with 53 percent of the damage claim remaining, we don't have a situation that fits under octane where the substantive strength of the overall case was lacking merit. The overall case still had a viable claim that could go forward to trial. But to answer more directly... You can't look at it on a claim by claim basis. Let's assume that the Microsoft devices were licensed and that you're right that the Unix and Linux infringement remained a possibility at least up to the time that you filed your expert report, which I guess is your contention, right? The expert report didn't cover them, so once you filed the expert report, it was going to be too late to include them in the case. But why isn't it possible to award attorney's fees because a major part of the claim was lacking in merit or frivolity? To answer, Your Honor, under octane fitness, it's a case by case analysis. It's not a claim by claim analysis. And I'm not familiar with any precedent that taking a party who is in a position to have carved out its various sub-claims and decided whether one of those should or should not have been brought at the outset. In the usual case of a Section 285 proceeding, you would have someone who's absolutely affirmatively a party who's won on the merits. Well, that seems to suggest that even if it had been 90-10, even if 90% of the case had been Microsoft and 10% had been Linux, that we still couldn't affirm an award of attorney's fees. Is that your position? It is our position, and we have at least a district court case to back that up. That's not E.ON.Net, but the other E.ON. case. It's a district court decision that says it can't be sanctionable conduct to proceed with a claim that's not worth very much. Now, in the usual case, in every litigation, things don't always end up the way they first appear. And parties win and lose issues and sub-issues all the time during the course of the case. That doesn't make a case rare or exceptional under Octane Fitness. I guess what I keep thinking is that perhaps you had an argument that after dismissal of the claim that some of the fees should not be chargeable because you still had some remaining piece of the case. But am I wrong in my understanding you did not make that argument to the district court? You didn't say that all the litigation work that the other side had to do for the 53% as a shorthand, that shouldn't be chargeable to us, even if all the litigation work that they did for the 47% should be. There was not an explicit allocation argument, but it was certainly implicit in the presentation to the district court, which explained that the Unix and Linux functionalities, the instrumentalities where Unix and Linux play the role of a host computer, were still in play. So that was an argument made to the district court. Where did you try to break down the fees attributable to that percentage of the case versus the Microsoft percentage of the case? Where do? Where did you try to break down the apportionment of the fees, though? I mean, if that's a portion of the fees where it shouldn't be charged because that's not part of the exceptional case file. The argument was not made below in those terms. That's correct, Judge. What you were arguing was that because part of the case was viable, that that precludes an award of fees for any part of it, right? That's right, Your Honor, and I don't see any precedent to the contrary. We've seen no precedent cited by NetApp or any of the Amici which say that a partially meritorious case ends up meriting Section 285 fee shifting as a rare exceptional case. Can I ask one other question? I guess this is about a piece of the record that remains confidential, and that is, did you argue to the district court that the license agreement between Summit and RPX did not automatically confer a license on Microsoft? That argument in those terms was not made to the district court. What we pointed out in our briefs is we are refuting the proposition stated for the first time in the judicial opinion that merely reading the agreement would lead one to conclude that Microsoft had some sort of sublicense rights. We even can point, Your Honor, to A2369. That's where the licensing and damages expert of NetApp was analyzing the terms of the license agreement and concluded that there's no automatic grant of a sublicense. It concluded that it says what it says. The agreement itself is in the record. The agreement is A1465. My question was not about the wording of the license agreement but about what you argued to the district court about the meaning of that license agreement. It was not argued in those terms to the district court because by that point in time, there was no dispute amongst the parties that there had been a sublicense. The inferences were made that the sublicense had been granted. There was a decision to disengage from the agreement insofar as anyone purportedly trying to argue hypothetically there is no sublicense grant. Summit didn't do that. In fact, that's an indication of good faith by Summit to accept the reality on the ground as it developed, as it learned the facts through discovery. But I think the problem that you have is you're now arguing there's a substantial question here about the license whereas that wasn't raised below and it wasn't raised contemporaneously when the license was first brought up. Well, Judge, like I said, for the very first time in the entire record, the district court said in its final opinion that merely reading the license would have allowed someone to conclude, merely reading the RPX agreement would have allowed someone to conclude that Microsoft had sublicense rights and therefore by extension, the accusation against NetApp shouldn't use that instrumentality. But again, the record also shows that that was against the other inferences to be drawn from reading the agreement. One inference to be drawn from reading the RPX agreement was that both RPX and Summit had carved out NetApp as someone who needed additional rights and would have to pay a substantial sum to get them. Can I ask you, you make an argument or suggestion in your brief about – I'll put it under the heading of NetApp was lying in the weeds for six or more months from April, early April when you turned over the license agreement until the email at the beginning of October when it contacted you and said we've got a license, there's a license here that defeats at least a big chunk of your claim. Can you explain what steps in the litigation process took place between early April and October at which you think they should have made their contention based on the license agreement known? I'm glad you brought that up, Judge, because I was just moving to that point. Between April and October it was virtually all of the heavy activity of the litigation. Up until then it had been the closing of the pleadings, there was a claim construction proceeding before then, and then discovery was just starting to be exchanged. So between early April and October all the depositions were taken, all the expert work was done. I believe the record would even show that all or almost all of the expert fees charged on NetApp's side were charged in the interim period. So I did want to point that out because in this court... I guess it seems to me that your suggestion of lying in wait depends on there having been filings that NetApp did make or had to have made, and in those filings it did not make the point it ultimately made in October. So what are those moments? Very simple. It's the interrogatory answer that NetApp was obligated to give, and I believe that was interrogatory five. Describing their defenses? It was one of the conventional interrogatories. You've pled license and exhaustion. Please state the factual basis for your pleading of license and exhaustion. That was a pending interrogatory. There was a boilerplate answer at the outset. At that point they, this is for their license defense, they were under an obligation to disclose that. And remember license is a waivable affirmative defense. We haven't even talked about the fact that there are... When did they see the RPX agreement? Pardon? When did they see the RPX agreement? That was produced on April 2nd of that year. I think it was 2012. Before the interrogatory answer? I believe... I would have to check, Your Honor, I'll tell you in the rebuttal time, and I see that my time is up, and if there are no further questions, I'll save my time for rebuttal, and I'll come back with the answer. Okay. Don't stop the clock for a moment, because this agreement is marked confidential, and I think the panel really wonders whether that's really necessary. It's going to make it difficult for us to write an opinion, given that fact. Is it possible for the parties to get together and decide that the agreement, or at least major parts of it, are not confidential? I think it's very possible. I think the parties are really being solicitous to the third party, who doesn't have a voice in these proceedings. Well, why don't you check with them, and if you conclude that it doesn't need to be confidential, why don't you file new briefs that delete the confidentiality markings? That would be helpful. Yes, Your Honor. Okay. Thank you. See you in a minute. Mr. Reines. Good morning, Your Honors, and may it please the Court. The district court judge here has heard thousands of patent cases, and it is extremely rare that he's ever designated anything 285. I mean, just a handful at most. Well, could he do that when, let's assume hypothetically for the moment, that 47 percent of the claim was potentially meritorious, or at least hasn't been shown not to be meritorious? Assuming that And that 53 percent was not meritorious, was frivolous. Assuming that, which obviously we don't agree with, I think, of course, he can, because of the flexible nature of the test. I mean, I think that's the point of the Supreme Court's jurisprudence recently in this area, is that each case needs to be looked at as his own. For this judge to pick out this one case with the pattern of settlement, with the nature of the expert admissions here, which we haven't really talked about, with the shifting explanations, I mean, just this Court alone today has gotten shifting explanations. The argument below about why they didn't know that the heart of their case was licensed activity was that it was a mutual mistake, that when Well, the heart of their case wasn't licensed activity, if you assume that part of the case was the Linux and Unix operating system. I think that's an example of where the district court judge has a real good vantage point, because the contention that they made in April, which was their contention in derogatory, at least according to them now, relies on Microsoft only, and only one product. And then even in expert reports, it's sort of hard to set aside the record. When was the contention in derogatory? Wilmington doesn't have the Northern District of California rules, right? So you rely on the derogatories. It was mid-April. Mid-April. So let me just do a reset on the timeline, because that seems to be important to this. The license in derogatory was in March before we had the RPX agreement, before we had their contentions, or anything else. We got a wave of information in April. Of course, it sounds simple to say you got the RPX agreement, but as you know, it was in a wave of electronic stuff that has to get processed. Right, but just on that, wasn't it a matter of mere days when your co-defendant, EMC, took a deposition of Mr. Lee, their Rule 36 witness, and specifically examined him about the license agreement? Yes, that's right. At least within days, this was not still buried. Well, I mean, buried in the sense that you only had a couple of days to prepare for deposition. It had been unearthed. I think it goes the other way. I mean, we only had a couple of days, and someone else was taking the deposition. There was eight parties at the time. I mean, now when we look back, it's so easy with hindsight to say this. But what's really important about this timeline, I think that does a real reset for you, is at the time of all this information exchange, the expert discovery cutoff was June 1. And both parties in their interrogatories said, this is all premature, you're going to get it in the expert reports in a matter of weeks. And to go in Delaware and try and get discovery enforcement on that is not practical. It's not un- Just to clear, you said in March, before the turnover of this agreement, that's when you filed your answers to the licensing interrogatory. Licensing interrogatory. Yes. Where we said it was premature. And was there an obligation at some point to update the answers or something, or even a new date for- Well, under Rule 26, I mean, there's a seasonability requirement. And in the course of this case, the seasonability requirement would turn on the expert report being June 1, which is just weeks away. That was the position they took on their contentions. I mean, you can't have a licensed defense before you understand what's being accused. And the- But you didn't understand what was being accused until the expert report is what you're saying, right? Absolutely. If you look back at their contentions- And that eventually became the end of August, right? August 31st? It moved once to August 1. Later on, before June 1, it moved to August 1. And then before August 1, it moved to August 28. So it was always just a few weeks away. To really fault NetApp for not bringing the fact that Acacia had licensed this technology already clearly and was suing based on it is the heart of the case. But if you look at their contentions, we can now parse now what it says, but it's one of these things where they just put lines to diagrams, and you don't know what they're alleging. And we challenge that. And it says right in their thing, this is preliminary information, it's all premature, because people hadn't exchanged documents until April. But I guess the problem that I'm having is until the expert report was filed, focusing on Microsoft, that it was open to them under the allegations of the complaint and the local rules to accuse the Linux and Unix operating systems. Once they filed the expert report, it became too late to add those. So at least until the filing of the expert report, there was potentially a part of this case that wasn't affected by the Microsoft license. Okay. Correct? Not in agreement for a few reasons. The first and most important reason why I'm not in agreement, and again, I think some of the weakness of their positions I want to reset, which is the license wasn't just to Microsoft. It was to 43 companies. It was to anybody that sold equipment. It was HP. It was IBM. But there's been no contention that the claims with respect to Unix and Linux operating systems were barred by the license. Of course. Those would be loaded on host computers, which would be IBM or anything else. Were they licensed parties under the RPX agreement? Yes. Everyone was licensed. What happened was they licensed the computer industry, anyone, I mean everyone, just you name it. The entire computer industry, that's half of the claim. The other half of the claim is the storage server industry. They sued the storage server industry. I understand what you're saying, but I don't recall if your brief made this point that there was a license defense with respect to the Linux and Unix operating systems. Absolutely. The point. Wait, wait, wait. Where in your brief did you say that? Anywhere where first the 43 parties were licensed, that they couldn't possibly come up with a claim. Where do you say that the case with respect to the Linux and Unix operating systems was frivolous? Look now, but I think where. Wait, wait, wait. They too were licensed. It's the question. I mean among other places it's where I said to their expert, you couldn't come up with any evidence. Just let me answer this one piece. You couldn't come up with any evidence that Unix and Linux were licensed because in the view of the fact that 43 different companies had licenses to the computer, you couldn't come up with a configuration. That's a question of mine that I quote and block and then quote. I mean I don't have the page number for you right now. No, but what I'm looking for in your brief is where you say that the claims with respect to Unix and Linux were also frivolous from the beginning because their operating systems were also licensed. I don't recall that argument being made in the red brief. I don't have a page for you. I'm sure a review of that and the brief below will discover that our point was the whole computer industry was licensed. How could the storage server industry be sued? I mean at least I guess what I'm remembering, which may not quite be a contention in this form, is you're disputing of the 53% figure because that figure didn't take into account all of the other RPX sub-licensed companies so that, in fact, much of that use may itself have been licensed. This is the reason. And you depose Zimmerman about that. This is the reason, among others, why their expert couldn't establish there was any viable theory. I mean the burden shouldn't be shifted to us to prove that they didn't have a claim that their expert said he couldn't make and he had no evidence of. It's a little Alice in the Wonderland. Their argument on the other system essentially that any computer system, those operating systems we work on, had already been licensed. Any computer company, whether it's an HP, whether it's a Mac, whether it's whatever, they'd already been licensed. There's no system or no company that makes computers that would use these Linux systems that weren't licensed. That's correct. But there's four or five other reasons why their expert refused to give the opinion. I mean their expert said he didn't have evidence of the position. I don't know why it would be deemed a viable position, why we would have to go disprove it, but I will. You're the one who's seeking fees. That's the problem. And so in order to establish right to fees, it seems to me that the burden is on you to show frivolity. We showed that the only thing their expert put evidence on, Your Honor said the only thing they put in their expert report was Microsoft and that that was frivolous by everyone's account. And that should be the end of the discussion. And the reason there's no more evidence on the Linux stuff is because it wasn't in their expert report and they dropped the case before there could be any more discovery into that issue. Well, just, I mean, the expert report says you're telling them to do it. I mean, nobody says you can go and do it afterwards. But their expert admitted he didn't have the evidence. But the other point that the expert report at A1568, he says that Linux and Unix work according to a standard that must support one connection but doesn't require multiple connections to be supported. I thought at A1573 he said pretty clearly, though, without pointing to something concrete, that a Linux, Unix complementary product would, in fact. They support it, is the assertion, with no documentary support. And then. I'm not disputing the absence of documentary support, but I thought A1573 was the one place in his opening expert report where he mentioned the possibility. At A1568 is the precursor where he introduces the standard. And he says the standard says they must support at least one connection and may support several connections. So under the standard, you might do it. And then the fact is, our expert put in, but Red Hat and numerous other Linux don't support multiple connections. They just don't. So you couldn't use it. Two is you'd have to show that not only was it being supported, which is optional under the standard, but then someone was configuring it to do that. Then you'd have to show not only they were configured to do that, but they were actually doing that. Then you'd have to show that they weren't being used with an HP, an IBM, an Apple, or a Microsoft computer. It's a frivolous position from the start. That's why their own expert didn't take the position. It's their burden. Let me address the burden issue. On a motion under 285, we're saying they're dropping their case because they missed what I'm describing as the heart of the case, because that's what their expert report asserted. We think that would be fair. That was frivolous by all accounts. They immediately acknowledged it. They said, yes, you're right. We licensed it. They originally argued that was a mutual mistake, that they gave a broader license than they thought. They've abandoned that now, and they say they're making this condition subsequent arguments. But I think the district court's decision to award fees was not based entirely on the failure to withdraw the suit, dismiss the suit, between the time of the expert report and October. He goes back to the beginning and says that this case was frivolous from the outset, and at least, as you just said, until the expert report was filed, that it remained open to them to accuse other operating systems as well as the Microsoft system. No, the expert report revealed the frivolousness, which was from the start. What the court said was it was reckless to sue systems that relied on Microsoft at the heart of your case, which is what happened, when you could have just looked at the license and figured out that it was licensed. And then he said, and your assumptions and guesses that maybe if someone configured some other equipment some other way in some other situation without expert support isn't enough to insulate you, given the pattern of settlements, given the other activity. That's a completely reasonable thing. Let me shift to ask you about the pattern of settlements, because I think what the district judge said in that connection raises some questions, because as I understand it, based on past cases, including our recent decision at SFA, that a pattern of nuisance settlements is significant only if the nuisance settlements are achieved through the assertion of frivolous claims rather than through the assertion of meritorious claims. And I don't read the district court here as finding that these nuisance settlements and these other cases were nuisance settlements resulting from the assertion of frivolous claims. I think the way the court read it, because he was familiar with it from claim construction, discovery, everything else, was that this was an attempt. They had licensed the entire computer industry, which specifically said the storage servers would be licensed to. Then they sued the entire storage server industry, and then they settled with them one at a time for $150,000. There's nothing the matter with that as long as the claims aren't frivolous, right? But this goes to the point that – Wait, wait. Is that true? I wouldn't say it is not. On the totality of circumstances, I'm not going to give you an absolute like that. But I agree with you that it's more significant if it's frivolous. I think the answer here is whether they – after the behavior that happened, where the heart of their case was shown to be frivolous, that they had a duty to say, here's what we were thinking. Here's what we were thinking about why we sued the others. Here's what we were thinking about why Linux. They didn't come forward with any evidence that suggested that any of this was in good faith. Let me run out of time. Can I ask you about the expert fee portion of this award? Aren't expert fees awarded under a different standard? Well, it's under a standard that was met by the district court judge here, under MARC Tech. Where did he articulate that standard and describe that standard as applicable here? He didn't invoke the inherent authority expressly. It's just like the MARC Tech case, which is a 2012 case. And there they said where it's clear that there was problems, that was a baseless case that caused expert discovery that was needless on all fours here, that it would be only logical to allow the recovery of the expert fees because they necessarily followed from the baselessness. I mean, the idea that NetApp – let me – I think it's a little sloppy, though. I mean, if there's two different standards and we're going to keep letting district courts just use the 285 standard and not talk about the other standard, then we don't have anything to review on what he thought the reasons for that baseless alike were. I agree that it was sloppy, but it wasn't sloppy by the district judge. It was sloppy by some at best because they didn't make the argument. They didn't oppose expert fees. They didn't say it was unrecoverable. They didn't say anything about that. They didn't make the argument at all. It's very – I mean, the second guessing of the district judge here is very, very difficult. Let me clarify that. So when you filed your application, you articulated the reason for expert fees under the proper standard, and they didn't oppose that? I believe so. Can I ask one more procedural question about the amount of the fees? In the final footnote of Summit's opposition to your fee motion, Summit said, if you are planning to award fees, please give us an additional opportunity to contest the amount after discussing the amount with NEDAP. Is there a local rule, a practice, some basis on which an expectation of a second stage proceeding might have been reasonable of the sort that, what is it, Rule 54 contemplates, though doesn't mandate? A good question. Absolutely not. Here, this was unique because there was a specific order. When they attempted to dismiss the case with strings attached, which is the opposite of good faith, the district judge said, no, I'm going to dismiss the case, but you can move for fees and set an order requiring when our application for fees – it wasn't bring a motion for exceptional case, it was your application for attorney's fees, and then an opposition date was ordered in a unique order that required them to do so. On top of that, in reply, we pointed out, we said, they haven't – this footnote's a little more cockamamie than that, but whatever it said, we said, we don't know what they're talking about. They've waived any argument about this. They then made other submissions to the court and never said, well, if they're going to argue waiver, then here's our opposition or anything else. We put in all our billing records with all the burden and things that are associated with that, and they just – the way they treated the whole litigation, they flagrantly blew it off, and they gave them self-relief. Any relief under Delaware Civil Local Rule 7.1.2a has to be sought by motion. If they want an extension of time, they're entitled to an extension of time. But isn't it fair to read their footnote as saying we're postponing any discussion about objections that we have to the amount of the fees until later? I think there is a genuine concern at district court level if parties were able to give themselves that kind of extension in footnotes, and if this court gave that in perimeter, non-prec or otherwise. Could it have given itself that extension if it had been in text? I mean, is the local rule such that by merely asking for an opportunity to oppose the amount later that they're automatically entitled to that opportunity? Absolutely not. I mean, that would be chaos in district court. I could tell the number of times I would avail myself of a footnote that says the other half, if we lose on our first argument, we'll only address the second argument. We're going to negotiate with the other side and do it later. I mean, the district court judge here can explain. It comes back to the question of whether that was the practice in Wilmington. That was not the practice. The cases they cite, well, first of all, the things that we've had to deal with in this case, on this issue, in their appeal brief, they did not argue any explanation why they failed to raise this issue below and address waiver. All of this supposed practice came in in reply. Okay. Absolutely a waiver. Absolutely outrageous as far as I'm concerned. I didn't have the opportunity to brief them, but I can tell you, so I can verbally do it, in many of those cases, amounts were put in and basically the district court judge said, well, we're only going to give a fraction, so we need briefing on that, or I'd like more briefing on reasonableness. That is completely different from this circumstance. Not one of those cases was from Judge Sleet. Each of the four district Delaware judges have their own practices, and if you know Judge Sleet, if you know I was in the district court on this, Judge Sleet, you don't give yourself an extension in Judge Sleet's courtroom right now. I'll tell you that. And any local counsel there knows that. Okay. Thank you, Mr. Reines. Thank you so very much. I'll bring you back to the timeline, Your Honors. Why don't you begin by addressing the last point as to whether there was such a practice in the district court. To be fair to Mr. Reines, Judge Toronto, your question to him may have been addressed to me as well, because it was our position that there is a local practice, and it's borne out by the case law. There's no – I can't point to a written rule. I can't point to – Well, why isn't it discretionary with the district judge to allow you to postpone it or not postpone any objections to the specific amount of the fees? I think it is discretionary with the district judge, and so what you see in our arguments in our reply brief is we do face head-on the allegation of waiver. We say – we don't think there's a waiver because of those. I mean, it's just that the district court didn't create an opportunity to challenge the fees in a later proceed. Right. It's discretionary, but we had no signal from the district court that it was going to rush to this kind of judgment when there are 10 or 15 cases we cited to you in the reply brief, Your Honors, where there was a staged approach, which was the expectation in Delaware practice. Were any of those from Judge Sleet? I haven't reviewed that myself recently, but I'll take it. I mean, given the fact that you can't cite a particular local rule in writing, how can you rely on the practice of other district court judges to have some kind of assumption on what a different district court judge is going to do? It's something I'm sure we wish we would have had an opinion from Judge Sleet that we could show you. We found what we found, and if there's not one from Judge Sleet, then there's not. What about the contention that the Linux and Unix operating systems were also licensed and that there was no basis for a claim with respect to them either? There is no position in this court that 42 other companies or 43 members, there's no position in this court that 42 other companies had a license. There's no proof of that. There's no evidence of that. It would require yet another round of trying to determine if there was a sublicense granted from RPX to those other 43. Are they listed in the RPX agreement? They're listed as members, so they're candidates who can receive a sublicense. But there's no proof, there's no inference, there's no acknowledgement that they actually did. And at worst, Your Honor, let's say all 43 had licenses or sublicenses at the outset. What that amounted to is, say, end users who were using a Hewlett-Packard computer versus, I don't know, a Gateway or an Asus. I'm sure I could find a type of computer, a brand of computer that's not on that list of 43. And so on their best day, what that does is it really constricts our damages claim. It's not a happy place to be as a plaintiff. I agree. So it's appropriate that if they were going to have that as a live issue to restrict and constrict and constrict our damages claim, of course the rational thing is for us to go and voluntarily dismiss. Another point on that. The more they argue that the entire computer industry was licensed through the RPX agreement, the more odd the rest of the RPX agreement becomes. Because the RPX agreement did have a carve-out for NetApp itself to become a sublicensee. It was never executed, but it was a substantial amount of funds that would have to be paid for NetApp to become a sublicensee under the RPX agreement. That provision would make no sense if RPX and Summit, at the time they contracted, had some sense or awareness that all routes to an infringement claim had been blocked via some sublicense operation. Okay, you're almost out of time. Do you have one last point you want to make? Only one last point, not buried. The RPX agreement was produced in a production of something like 200 pages, so it was certainly easy to roll through and learn what was in it. And so with that, Your Honors, we would request a reversal, or at least a remand for reconsideration with this Court's guidance, and I thank you for your time. Okay, thank you. Thank both counsel, the case is submitted. Thank you. Thank you. Thank you. Thank you.